UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04-CV-226-H

MICHAEL DODD                                                                PLAINTIFF

V.

DYKE INDUSTRIES, INC.                                                DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Michael Dodd ("Plaintiff") has sued his former employer, Dyke Industries, Inc.,

("Defendant") alleging breach of contract, fraud, and illegal pay practices in violation of Ky.

Rev. Stat. Ann. §§ 337.055 and 337.060(2)(e).  Several motions are now pending before the

Court, most significantly Defendant's Motion for Summary Judgment and Plaintiff's Cross-

motion for Partial Summary Judgment.[1]  Except for a limited portion of Plaintiff's Cross-motion

for Partial Summary Judgment, the Court will deny all of the motions.

This decision does narrow the contract issues.  Nevertheless, issues of contract

interpretation and fact remain.  The Court observes that certain remaining aspects of Plaintiff's

breach of contract, fraud, and statutory claims may well be difficult to prove at trial. Indeed,

Plaintiff's heavy reliance on what he was allegedly told regarding how his commission was

calculated will be of no relevance in proving a breach of contract claim based on an

---

[1]In addition, Defendant has also moved to: Strike Plaintiff's Cross-Motion for Partial Summary Judgment,
Strike Plaintiff's Expert Reports, Strike Affidavits of Jerry Martin, Kelly Clore, Shawn West, and James
Hoffmeister.

unambiguous written contract. However, on the basis of the record before it, the Court does not find either that Plaintiff's claims are barred as a matter of law, or that he has offered so little evidence that no reasonable juror could find in his favor.[2]

## I.

The Court has, in its prior opinions discussed the events surrounding this case at length, making only a brief review necessary here. Plaintiff worked as a salesman for Defendant from 1987 until he voluntarily terminated his employment in 2003. Beginning on January 1, 1989, Plaintiff worked under the terms of a written compensation plan ("Compensation Agreement"), which provided for payment of a draw of $2,083 per month, plus a commission supplement. The Compensation Agreement states:

> A <u>Sales Commission</u> will be determined from the Net Sales billed to customers while assigned to each salesman.
>
> Net Sales equal Gross Sales, less Freight, Credit Memos and Bad Debts.
>
> A)    "Less Freight" means all warehouse sales will be reduced by a percentage (determined by Management) to cover the cost of all delivery expense.
>
> B)    All Credit Memos issued to the assigned customers will be deducted from Gross Sales prior to computing salesman's commissions.
>
> C)    All Bad Debts will be determined by Management. The amount deducted from the Reserve will not exceed two times the commission on these sales.
>
> Full recovery of a Bad Debt will be shared with salesman on the same basis as deducted, net of collection expense.

It is the Company's sincere hope that, with the diligent help of salesman, no deductions

---

[2]The Court did not rely on the analysis contained in Plaintiff's expert reports or on the testimony contained in certain affidavits that Defendant has moved to strike. Therefore, it is unnecessary to strike these submissions from the record.

for Bad Debts will be necessary.

<u>Schedule of Compensation</u>
A Commission of 15% of the Gross Profit on net shipments, less drawing account and any expenses paid to salesman, will be paid after the close of business each month on all shipments made to the assigned accounts.  A Reserve of 25% will be withheld from Commissions each month, and will be paid after the close of business each calendar year.

Gross Profit is determined by subtracting the cost from the net selling price.  It is agreed and understood that Management has the sole right to determine the cost of all items sold.

. . .

TENTH:      Company reserves the right to make any changes in the Compensation Plan as may be necessary on thirty (30) days written notice.

Mot. for. Summ. J. Exh. 4.  Plaintiff alleges that Defendant incorrectly calculated Plaintiff's commission – specifically, by: (i) improper adjustments to commission calculations when a customer returned an item Plaintiff had sold ("Credit Memos"), and (ii) improper determination of the "cost" of the items Plaintiff sold.  Plaintiff further argues that Defendant fraudulently concealed and affirmatively misrepresented the methods it used to calculate his commission.  Plaintiff also claims that Defendant violated Kentucky law prohibiting certain deductions from an employee's wages, *see* Ky. Rev. Stat. Ann. § 337.060(2)(e), and that Defendant unlawfully withheld wages that were payable to Plaintiff in September 2003 in violation of Ky. Rev. Stat. Ann. § 337.055.

Defendant has moved for summary judgment on all claims and Plaintiff has moved for partial summary judgment on its breach of contract and statutory claims.  Summary judgment is proper if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying Rule 56(c), a court views the evidence in a light most favorable to the non-movant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court properly enters summary judgment where there is not sufficient evidence in support of the non-movant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## II.

The Court will first address Defendant's argument that the Kentucky Wages and Hours Act, Ky. Rev. Stat. Ann. § 337.010 *et seq.*, preempts Plaintiff's common law claims for breach of contract and fraud. The common law claims are preempted, Defendant says, because the Wages and Hours Act specifically prohibited all of the allegedly unlawful actions. *See, e.g. Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985)(holding that "where a statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute"). Defendant argues that because Plaintiff's claims are preempted by statute, the applicable statute of limitations is five years. *See* Ky. Rev. Stat. Ann. § Ky. Rev. Stat. Ann.§413.120(2)(limiting actions upon liabilities created by statute, when no other time is fixed by the statue creating liability). Imposition of a five-year statute of limitations would limit Plaintiff's recovery to wages allegedly due on or after April 14, 1999[3], which is a significantly shorter recovery period than that available for common law breach of a written contract (recovery for wages due on or after 1989)[4] or fraud in performance (recovery for

---

[3]This is five years from the date Plaintiff filed his original complaint.

[4]The statute of limitations for a written contract is fifteen years.

4

wages due on or after 1995).[5] The Court has tip-toed to the water's edge of this issue in two

previous opinions in this case.

A.

Kentucky federal and state court have applied the preemption doctrine to other statutes,

including the Kentucky Civil Rights Act, the Kentucky Occupational Safety and Hazards Act,

and ERISA.  But, the Court finds no cases holding that the Wages and Hours Act preempts a

common law contract claim.  The absence of such a case does not seem due to a lack of

opportunity to consider the issue.  Notably, in *Noel v. Season Sash, Inc.*, 722 S.W.2d 901 (Ky.

Ct. App. 1986), the court, after expressly recognizing the *Grzyb* preemption doctrine,

distinguished wage claims created by statutory language from those which emanate from

contract.  *Id.* at 902-03 (noting where "an employer and employee have contracted for certain

wages and benefits, a claim for wages arising from that contract is clearly a matter for which

jurisdiction is vested in our trial courts.  In such a case the duty to pay the wage emanates from

the contract, not the statute.").  Though the Kentucky Supreme Court has encroached upon other

parts of the *Noel* holding, neither it nor any other court has addressed further the preemption

issue.[6]  Here, some of Plaintiff's allegations "emanate from contract" as opposed to statute.  In

the absence of any Kentucky decision indicating that the Wages and Hours Act preempts

---

[5]In an earlier Memorandum Opinion, this Court concluded that Plaintiff's fraud in the performance claim
could include claims as far back as 1995.  *Dodd v. Dyke,* 518 F. Supp. 2d 970 (W.D. Ky. 2007).

[6]The *Noel* holding was later limited only to the extent that it concluded that original jurisdiction of statutory
Wages and Hours claims was exclusively vested in Commissioner of Labor Circuit reversed a district court's
issuance of summary judgment for a breach of contract and statutory claim.  *Parts Depot, Inc. v. Beiswenger*, 170
S.W.3d 354, 361 (Ky. 2005).  Thus, *Parts Depot* instructed that unpaid Wages and Hours claims may be brought in a
court of original jurisdiction regardless of whether they are premised on specific statutory provisions or upon the
parties' private agreement.  *Id.* ("We now hold that KRS 337.385, the more specific statute, takes precedence over
KRS 337.310, the general statute, whenever an employee, or the commissioner on employee's behalf, chooses to
exercise *the judicial remedy* for recovery of unpaid wages.")(emphasis added).

contract claims, the Court is reluctant to predict that such a significant restriction upon the common law of contract is in the offing.  *See also, Oaks v. 3M Co.,* 453 F.3d 781 (6th Cir. 2006)(remanding for further proceedings a case in which a Plaintiff sought to pursue *both* a breach of contract claim and a statutory claim pursuant to Chapter 337).  Before doing so, the Court would want a more positive inclination from related state court discussions.[7]

Nor does the Court find that the Wages and Hours Act preempts Plaintiff's common law fraud claim.  Though an older version of Ky. Rev. Stat. Ann. § 337.060 specified liability for an employer who withheld wages "willfully with intent to defraud," the statute was amended in 1978 to specifically remove the phrase "intent to defraud."[8]  An employer could therefore violate the Wages and Hours Act without fraudulent intent.  *See, e.g.* Ky. Rev. Stat. Ann. § 337.385(1)(providing an exception for liquidated damages in the case that an employer shows that "the act of omission giving rise to such action was in good faith . . .").  Thus, Plaintiff's fraudulent misrepresentation claims regarding concealment of commission calculations are separate from Plaintiff's statutory Wages and Hours Act claims.

---

[7]Further complicating the analysis is a recent Kentucky Court of Appeals decision, currently before the Kentucky Supreme Court on discretionary review.  The Court of Appeals held that "[u]nder the plain language of KRS 337.060(1), an employer may not withhold any part of the wage **agreed upon**.  Under the terms of the Compensation Plan, the appellees agreed that their commissions would be debited under certain circumstances . . .Therefore, the wages that they had agreed upon included this provision for charge backs by the employer.  AT&T did not withhold any part of the wage 'agreed upon.' . . . The purpose of the statute is to prevent employers from recouping their losses from wages that they have agreed to pay their employees." *AT&T Corp. v. Fowler*, –S.W.3d–, 2007 WL 2684991 (Ky. Ct. App. 2007).  *See also Kimmel v. Progress Paint Mfg. Co.*, 2003 WL 1226837 (Ky. Ct. App. 2003)(unpublished)(observing "we do not believe the legislature intended KRS 337.060 to apply where there exists a *bona fide* dispute concerning wages.").  These decisions suggest that far from preempting all common law claims, Ky. Rev. Stat. Ann. § 337.385(1) via 337.060 is, in some instances not an available vehicle for a plaintiff where there is a dispute as to the wages "agreed upon."

[8]In support of its argument that Plaintiff's fraud claim is preempted, Defendant cites *Poynter v. Louisville Ry. Co.*, 218 S.W.2d 658, 660 (Ky. 1949)(observing that it is unlawful for employers to withhold wages only in the event the employer willfully withheld wages with intent to defraud).  *Poynter* was decided prior to the 1978 amendment to Ky. Rev. Stat. Ann. § 337.060, which removed the "intent to defraud" and is therefore not persuasive authority for Defendant's argument that the fraud claim is preempted by the statute.

B.

The Court must also consider whether Plaintiff's decision to bring some of his claims pursuant to common law instead of under §337.060(1) affects the applicability of the statutory liquidated damages and attorneys fees provided by Ky. Rev. Stat. Ann. § 337.385(1)(Employer's Liability; Unpaid Wages and Liquidated Damages).  In relevant part, the statute states:

> (1) Any employer who pays any employee less than wages and overtime compensation to which such employee is entitled *under or by virtue of KRS 337.020 to 337.285* shall be liable to such employee affected for the full amount of such wages and overtime compensation, less any amount actually paid to such employee by the employer, *for an additional equal amount as liquidated damages, and for costs and such reasonable attorney's fees as may be allowed by the court . . .*

Here, Plaintiff argues strenuously that he has "chosen to pursue his claims for breach of contract and fraud in the performance as separate and distinct claims." (Resp. to Mot. for Summ. J. 51).  However, in the Second Amended Complaint, Plaintiff alleges that "[b]y reason of Dyke Industries' breach of the Agreement, Dodd is entitled to recover double his damages suffered by reason of such breach, attorney fees, and costs pursuant to KRS 337.385(1)." Second Am. Compl. Count V (Damages Pursuant to KRS 337.385(1)) ¶¶ 53-58.  Thus, Plaintiff appears to disavow that his claim is rooted in statute for purposes of avoiding application of a shorter statute of limitations, while he seeks to benefit from the statutory liquidated damages and attorneys fees provided by Ky. Rev. Stat. §337.385.

Kentucky courts have not explicitly addressed such a "having your cake and eating it too" scenario.  *Parts Depot* held that for purposes of subject matter jurisdiction, "KRS 337.385, the more specific statute, takes precedence over KRS 337.310, the general statute, *whenever* an employee, or the commissioner on employee's behalf, chooses to exercise *the judicial remedy* for

7

recovery of unpaid wages." 170 S.W.3d at 361-62 (emphasis added). Notably, the *Parts Depot* court issued its holding upon review of a case wherein the plaintiffs had "neither asserted a violation of KRS 337.060 ("No employer shall withhold from any employee any part of the wage agreed upon.") nor purported to file their action under the authority of KRS 337.385(1). *Their complaint can best be characterized as one for common law breach of contract.*" *Id.* at 357 (emphasis added).[9] The *Parts Depot* did not discuss the availability of liquidated damages and attorneys fees to one who chooses to bring a common law action to recover wages.

Absent clear guidance elsewhere, the doctrine of election of remedies helps to resolve this question. This doctrine "means that when a person has at his disposal two modes of redress, which are contradictory and inconsistent with each other, his deliberate and settled choice and pursuit of one will preclude his later choice and pursuit of the other." *Collings v. Scheen*, 415 S.W.2d 589, 591 (Ky.1967). From his complaint, his choice between pursuing a breach of contract claim or a §337.060(1) claim via §337.385(1) does not appear "settled." However, the damages specified in §337.385(1) are available to those entitled to wages under "under or by virtue of KRS 337.020 to 337.285." Plaintiff has explicitly disavowed bringing his breach of contract claim under these statutes ("No employer shall withhold from any employee any part of the wage agreed upon"), and there is no indication that Plaintiff's breach of contract claim could constitute independent statutory wage and hour violations.

The Court therefore concludes that Plaintiff's election to plead part of his case as a common law breach of contract and fraud relieves him of the §413.120(12) statute of limitations which applies to statutory claims, but also forecloses him from the liquidated damages and

attorneys fees provided for *by the statute* Ky. Rev. Stat. Ann. §337.385(1).  Any other result would seem unfair because it would allow a plaintiff to characterize his claim as a common law claim for purposes of an advantageous statute of limitations, but as a statutory claim for purposes of statutory liquidated damages and attorneys fees.[10]

## III.

The Court now turns to Plaintiff's claim that Defendant breached its obligations under the Compensation Agreement.  To succeed on a breach of contract claim, a party must prove the following elements: (1) existence of the contract; (2) full performance by the party claiming a breach; (3) breach of the agreement; (4) facts which show loss or damage by reason of the breach.  *See Fannin v. Commercial Credit Corp.*, 249 S.W.3d 826 (Ky. 1952); *Ebner v. Official Bd. of the Methodist Episcopal Church of Pineville*, 282 S.W. 785 (Ky. 1926).  "In every contract, there is an implied covenant of good faith and fair dealing."  *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991).  Under Kentucky law, contract interpretation is a question of law for the Court to determine.  *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005).  To interpret a contract, the Court looks to its language to determine the parties' intentions.  *See Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006).  "Where no ambiguity exists in the contract" the Court looks "only as far as the four corner of the document to determine that intent."  *Id.*  Whether the contract is ambiguous is a question of law for the Court to determine.  *Id.*  "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell Supply, Inc. v.*

---

[10]To be clear, Plaintiff brings separate claims which are strictly statutory violations, and are not alleged to breaches of contract under Ky. Rev. Stat. Ann.  §§ 337.060(2)(e), 337.055.  For those claims, the employer's liability is fixed by §337.085(1), and attorneys fees and liquidated damages would be available.

*Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

As far as the Court can discern, Plaintiff alleges that Defendant breached the Compensation Agreement in three distinct ways.  First, Plaintiff says that Defendant calculated his commission on the basis of "net profit" instead of "gross profit" as the Compensation Agreement specifies.  Resp. to Mot. for Summ. J. 37.  Second, Plaintiff improperly issued Credit Memos when a customer returned an item Plaintiff sold.  Finally, Plaintiff contends that Defendant improperly calculated its "costs."   The Court will consider each of these allegations in turn.

A.

The first alleged contractual breach arises from Defendant using what Plaintiff describes as "net profit" instead of "gross profit" to calculate his commission.  Plaintiff bases this allegation on his review of Defendant's Expert Report prepared by Diane Medley.  The report, Plaintiff says, misrepresents "net profit" values as "gross profit" values.  After examining the report and the underlying documents on which it relies, the Court observes that "gross profit" as the phrase appears in Defendant's income and expense statements for the entire branch may not necessarily reflect "gross profit" as the phrase is used in the Compensation Agreement for purposes of calculating an individual salesman's compensation.  The Compensation Agreement adequately defines "gross profit."  It specifies that "[g]ross profit is determined by subtracting the cost from the net selling price." There could be a significant distinction between the figure labeled as "gross margin" or "gross profit" as an accounting term in the income statement versus how that term is defined in the Compensation Agreement.  Indeed whether the calculation method of Plaintiff's commission violates the Compensation Agreement is the central issue in

10

this lawsuit.

The Court rejects Plaintiff's contention that differences in what is labeled "gross" or "net" in income statements for the entire branch as compared to how those phrases are used in the formula for calculating an individual's compensation constitutes "indisputable" proof that Defendant breached the Compensation Agreement.

Therefore, the Court disagrees with Plaintiff's contract interpretation as a matter of law. The evidence will determine whether Defendant correctly calculated Plaintiff's commission.

## B.

Plaintiff's second contention is that Defendant improperly recalculated his commission when it issued a "Credit Memo." A Credit Memo is a transaction involving a customer return. On at least some occasions involving Credit Memos, Defendant "zero-costed" the return when recalculating the affected salesman's commission. Zero-costing consists of backing the sales dollars associated with the customer return out of the commission equation, and giving the "Cost" of the goods returned a value of $0.01 in the commission equation.[11] The parties disagree, however, on whether zero-costing was used only "in instances where the salesman should not accept the return from the customer" so that "salesmen share in the loss on items returned in violation of the policy" or whether, as Plaintiff alleges, Defendant zero-valued "virtually all" customer returns.

The Compensation Agreement provides, "[a]ll Credit Memos issued to the assigned

---

[11]Defendant offers the following illustration by way of example: "a $100 sales, with a 22% gross profit, times a 15% commission, should generate a $3.30 commission. If a zero-costed credit was later issued, the salesman's sales for the month would be reduced by $100 and his gross profit would be reduced by $99.99. Total commission earned for the month would be reduced in this example by approximately $15." Mot. for Summ. J. 19 n.6.

customer will be deducted from Gross Sales prior to computing the salesman's commission."

Both "Gross Sales" and "Cost" are separate factors in the commission equation.  Although the

Compensation Agreement states that Credit Memos reduce "Gross Sales," it does not indicate

how Credit Memos affect "Cost."  Upon review of this language, Defendant's own expert stated:

"Our reading of this provision is that the total sales price of the item returned will, in fact, be

deducted from the Gross Sales.  *There is no indication that any adjustment should be made to the*

*calculation for the cost of the item returned.*"  Def.'s Expert Report at 3.

The Court is unpersuaded that a reasonable person could interpret that language to permit

an adjustment to "Cost" in connection with the issuance of a Credit Memo.  The language

regarding Credit Memos is simply not "reasonably subject to more than one interpretation"

regarding whether a "Cost" adjustment is part of a Credit Memo recalculation.[12] The Court

therefore concludes that zero-valuing is not a practice "in accordance with [the contract's]

express terms." *See First Commonwealth Bank of Prestonsburg*, 55 S.W.3d 829, 836 (Ky. Ct.

App. 2000).

Defendant, however, argues that even if zero-valuing was inconsistent with the terms of

the Compensation Agreement, Plaintiff acquiesced to Defendant's "consistent construction" of

the Agreement through his 17-year at-will employment and is therefore "precluded a recovery"

under a breach of contract claim.  *See Wilson v. Morrison*, 153 S.W. 441 (Ky. 1913).  Defendant

says Plaintiff "could instantly discern instances of zero-costing from his monthly sales report"

---

[12]As Defendant describes the commission formula, it consists of three steps:
a. Gross Sales Price - Freight, Credit Memos, and Bad Debt = Net Sales Price;
b. Net Sales Price - Cost of Items Sold = Gross Profit;
c. Gross Profit * 15% = Commission Paid to Dodd.
According to this formula, once the Gross Sales Price has been adjusted, the returned item is not an "Item Sold" and therefore, the entire cost should be credited to the "Cost of Items Sold" prior to calculating the Commission.

12

and was therefore on notice of it as early as 1994.  Plaintiff disputes that monthly sales reports provided him with notice and this Court has already concluded that Plaintiff could not have actually "discovered" the activity of which he complains until 1999.  *Dodd v. Dyke,* 518 F. Supp. 2d 970 (W.D. Ky. 2007).  The record does not reflect that Defendant either gave written notice of this contract deviation or that Plaintiff ever explicitly agreed to zero-valuing.[13]  Under these circumstances, Plaintiff's continued employment does not indicate that he "acquiesced" to such a practice.

The Compensation Agreement is unambiguous in its description of how Credit Memos affect the commission calculation.  Therefore, the Court declines Defendant's request to apply the doctrine of "contemporaneous construction" which provides that "the construction of the parties is best evidenced by their conduct with respect to the agreement."  *See A.L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1981).

Therefore, the Court concludes that as a matter of law the practice of zero-valuing breached the Compensation Agreement.  Plaintiff is entitled to summary judgment on this aspect of his contract claim.[14]  The evidence at trial will determine the extent that Defendant employed this practice.

---

[13]In this way, *Wilson* is distinguishable because there the plaintiff agreed to a reduction in wages and only later attempted to recover the wages due under the terms of the original employment contract.  *See, e.g., Wilson*, 153 S.W. at 443 ("defendant proposed that he pay plaintiff at the rate of 30 cents an hour, and plaintiff agreed to this arrangement.").

[14]The Court notes that Defendant has moved to strike Plaintiff's cross-motion for summary judgment, which was filed as part of Plaintiff's Response to Defendant's Motion for Summary Judgment, on the grounds that it was not timely filed.  Because the Court finds this issue ripe for adjudication as a matter of law, without resort to extrinsic evidence, the Court will consider Plaintiff's motion.  Although the Court believes that Defendant has ably briefed the issue of zero-costing in the course of its Motion for Summary Judgment and Reply, the Court will entertain a motion to reconsider its ruling on this issue if Defendant wishes to submit additional argument on this point.

C.

The Court now addresses Plaintiff's allegations that Defendant's method of computing the "Cost" factor of the commission equation breached the Compensation Agreement. The analysis begins with the Compensation Agreement language. "Cost" is one of the commission factors described in the Compensation Agreement. The Agreement states: "Gross Profit is determined by subtracting the cost from the net selling price. It is agreed and understood that Management has the sole right to determine the cost of all items sold." The Compensation Agreement does not describe or list any limits on Management's "sole right" to determine cost. Nor does it state that Plaintiff has any right to information on how Management determines "Cost." Defendant says the Agreement's unambiguous language gives it "unilateral authority" to determine the "Cost" and that Plaintiff agreed to Defendant's exercise of that unilateral authority when he signed the Compensation Agreement. Plaintiff counters that the "right to determine cost" did *not* afford Defendant the right to supply "purely random values" that are "not truly reflective of 'cost'." Resp. to Summ. J. 55. The legal issue before the Court is not whether the contract language is ambiguous. It plainly vests discretion and the right to determine cost with Defendant.

On one hand, and as this Court has previously acknowledged, "[a]lthough it is recognized that implied in each contract is a covenant of 'good faith and fair dealing,' such a covenant does not preclude a party from enforcing the terms of the contract . . . It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained." *Hunt Ent., Inc. v. John Deere Indus.*, 18 F. Supp. 2d 697 (W.D. Ky. 1997)(quoting *Travelers Ins. Co. v. Corporex Properties, Inc.*, 798 F.

14

Supp. 423, 425 (E.D. Ky. 1992); *see also Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d

308, 313 (6th Cir. 1997)(noting that "a party's acting according to the express terms of a contract

cannot be considered a breach of the duties of good faith and fair dealing.").

      The question presented here is whether under Kentucky contract law Defendant's

calculation of "Cost" was "according to the express terms of [the] contract."  Taken to its

extreme, "sole right" means that Defendant could supply any figure at all for "Cost."  If this were

true, Defendant could pay Plaintiff any commission it wanted, regardless of the volume of net

sales that Plaintiff generated in a given period.  This would be so because Defendant,

unconstrained by the plain language meaning of the term "Cost," could supply any definition it

wanted to the "Cost" factor.  If this were a legally permissible interpretation of the contract,

Defendant's promise to pay a commission would be meaningless.  The term "Cost" is not an

open vessel into which Defendant can pour any figure.  Notably, the express terms of the

Agreement do <u>not</u> vest Defendant with the sole right to determine Plaintiff's bottom-line

commission or even "Gross Profit." *But see* ("Well, when we have the right to determine the

cost, I guess you might say we almost have the control of the gross profit in our hands.")

Defendant's President,  Fred Edick Dep. 60.

      The Court thus concludes that whether a contractual breach has occurred with respect to

the calculation of "cost" depends on whether the method that Defendant actually used to

"determine cost" was so "random" or "arbitrary" that its determination could not reasonably be

said to relate to any ordinary meaning of "cost."  *See, e.g. Frear v. P.T.A. Indus, Inc.*, 103

S.W.3d 99 (Ky. 2003)("a court will interpret the contract's terms by assigning language its

ordinary meaning").  To be clear, Defendant's "Cost" determination would not be "arbitrary" or

15

"random" merely because it differed from Plaintiff's expectation or understanding, from whatever source, of how cost was calculated (i.e. vendor cost + 2% "carrying charge."). Resort to extrinsic evidence is not the standard by which the unambiguous contractual language is interpreted. *Id.*

Defendant purports to "determining cost" by starting with "replacement cost" which is the cost that management reasonably expects to pay for merchandise not yet received. Based on audits, it then determines factors for "direct labor, waste, damage, obsolescence, warehousing expenses, general office cost, and other items." Mot. for Summ. J. 11. These factors are "added to replacement cost as a percentage of replacement cost to determine the cost of goods sold that is ultimately used" in the commission equation. *Id.*. The evidence before the Court also establishes, however, that on some occasions, Dyke "determined cost" by applying a multiplier of .78 or .80 to the selling price of an item. In these instances, Defendant "determined cost" not by reference to *replacement cost*, but by referencing the *selling price*.[15] *See generally* Syler Dep. Defendant maintains that "the actual multiplier used was determined by Management and was intended to approximate a branch's actual financial performance" and that this method is used "because of the volume and customized nature of its products" which make determining replacement cost difficult. Def.'s Reply 2. Defendant's Branch Manager also testified that sometimes Defendant added a flat percentage (in addition to the multiplier) to cost, "when [the branch] went through these tough patches." *See* Peach Dep. 51.

Though acknowledging Defendant's "sole right to determine cost," either this Court or a jury must determine whether either: (i) applying a multiplier to the *selling price* to "determine

---

[15]The parties dispute the frequency and circumstances under which Defendant applies a multiplier to *selling price.*

cost" or (ii) adding flat percentage pads to the cost of items sold by Defendant is inconsistent with any ordinary meaning of "determining cost."  The issue is not whether Defendant is reasonably exercising its discretion.  It plainly has the "sole right."  Rather, the question is whether its methods in doing so are consistent with the ordinary meaning of "determining cost."

IV.

The Court next considers Plaintiff's fraud claims, which arise from Defendant's alleged representations to him about how it calculated "Cost" in his commission equation.  In an action for fraud under Kentucky law, "the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or recklessly made d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  The party asserting fraud must establish each element by clear and convincing evidence. *Miller's Bottled Gas v. Borg-Warner Corp.,* 955 F.2d 1043, 1041 (6th Cir. 1992).

At the outset, the Court declines Defendant's request to reconsider its previous ruling regarding the applicable recovery period and statute of limitations.  The Court remains convinced that the cumulative impact of the evidence indicates that Plaintiff could not have "discovered" the basis for his claim until 1999 and that "even greater diligence [by Plaintiff] would have been fruitless."

The Court also rejects Defendant's argument that, as a matter of law, Plaintiff could not prove several of the elements necessary to support as fraud claim, specifically because a) the alleged misrepresentations were immaterial, b) the alleged fraudulent statements were not known to be false, c) he could not show that he relied on any alleged misrepresentation, and d) he has

17

not shown any injury or damage.

Plaintiff has testified that Peach told him that "cost" for purposes of the commission equation was calculated by reference to invoice cost paid to the manufacturer plus a 2% carrying charge. *See* Dodd Dep. pp. 64-65, 71-72.  Plaintiff's argument is that although the Compensation Agreement provides the Management the "sole right to determine cost" and also has the "right to make any changes in the Compensation Plan," once a decision is made to change the way the commission is calculated, Defendant is obligated to provide "thirty (30) days written notice."  By representing to Plaintiff that "cost" was determined by one method, but actually using another, Plaintiff alleges that Defendant made a statement that it knew was false. Peach testified, for example, "if a salesman has a tendency to know cost, they'll sell to a number." Peach Dep. 82.

Defendant says that it did not know that the statements were false at the time that they were made, because it never meant that "cost" was "vendor cost" or "true cost" as Plaintiff understood those terms and that if Plaintiff had ever asked how cost was calculated, Defendant would have explained it.  However, this statement is undercut by Peach's testimony that he "more than likely" and "probably" had told other employees not to tell salesmen how "cost" was calculated.  Peach Dep. 82-83.   Peach admitted that if the cost method were revealed to salesman, "they'll tell [sic] you into bankruptcy."  Peach Dep. 56.  Moreover, if Plaintiff proves that such statements were made, their falsity would be known because the alleged speaker was the Branch Manager who could know "cost" was actually determined.

In addition, Plaintiff testified that he relied on Peach's assurances in deciding whether to continue his employment with Defendant, and that he voluntarily terminated his employment

18

shortly after he learned the full extent of Defendant's costing practices. Defendant further argues that it was not reasonable for Plaintiff to rely on the alleged misrepresentations. Defendant directs the Court's attention to *Davis v. Siemens Medical Solutions USA, Inc.,* 2007 WL 710133 (W.D. Ky. Mar. 6, 2007)(holding "if [plaintiff] was presented with a Plan whose commission structure could reasonably be interpreted in only one way, and that way directly contradicted the oral representations allegedly made by [Defendant] concerning his commission structure, it necessarily follows that [plaintiff's] reliance on the oral representations was not reasonable, once he was presented with, and accepted his written job offer."). *Davis* is factually distinguishable in two ways. First, unlike in *Davis*, the allegedly false statements was not made for purposes of inducing the plaintiff to enter the contract. Second, unlike *Davis*, a statement that, for example, "cost" is "true cost plus 2%" does not necessarily "directly contradict" the terms of the Compensation Agreement. In addition, the parties vigorously dispute when and whether Plaintiff had "means at hand" to discover the truth or falsity of the representation and how accessible the records which might reveal "cost" were. *See, e.g. McClure v. Young*, 396 S.W.2d 48, 51 (Ky. 1965). Thus, resolution of these disputed facts are necessary to determine if Plaintiff satisfies the "reasonable reliance" element of his fraud claim.

Defendant also says that Plaintiff could not prove any damages, beyond the damages he would claim for breach of contract. However, determination of injury and damage remains an issue for trial, and Kentucky courts have not held that the economic loss doctrine bars fraud claims for employment contracts. *See, e.g. Davis v. Siemens Medical Solutions,* 399 F. Supp. 2d 785 (W.D. Ky. 2005). The Court therefore concludes that multiple factual disputes preclude summary judgment on the elements of Plaintiff's fraud in the performance claim.

19

Finally, the Court follows the Kentucky Supreme Court's rule that a plaintiff "will not be precluded from maintaining an action for damages for the fraud, even though he goes ahead and completes his contract." *Sanford Const. Co. v. S&H Contractors, Inc.*, 443 S.W.2d 227, 236 (Ky. 1969). True, lower Kentucky courts have held that "affirmance or continued performance by the defrauded party under the contract also effectively waives the right to damages," however an exception exists "if recision of the executory contract by the defrauded party would result in damages clearly in excess of those generated by continued performance." *Hopkins v. Performance Tire & Auto Serv. Center,* 866 S.W.2d 438, 440-41 (Ky. Ct. App. 1993). "What facts are necessary to create a waiver is a question of law; but whether such facts were or not true, if denied, is a proper question to be determined by the jury. . ." *Thomas Jefferson Fire Ins. Co. of Louisville v. Barker*, 251 S.W.2d 862, 864 (Ky. 1952).

Here, Dodd alleges that he only discovered the full extent of Defendant's allegedly fraudulent costing practices in summer 2002, and that he left as soon as practicable after that discovery. In light of the parties' factual disputes over which documents would have revealed which information to Plaintiff at a given time, the Court concludes that resolution of the waiver issue is properly left for the jury.

V.

Finally, the Court considers Plaintiff's statutory claims under the Wages and Hours Act. First, Plaintiff says that Defendant withheld the commission that Plaintiff earned during his last month of employment in alleged violation of Ky. Rev. Stat. Ann. § 337.055 ("Any employee who leaves or is discharged from his employment shall be paid in full all wages or salary earned by him . . ."). Plaintiff alleges that Defendant did not pay him commission he made from August

20

25, 2003 until the end of his employment at Dyke Industries.  Defendant says that because Plaintiff cannot prove that he worked a single day in September 2003, he has been paid all the wages to which he was entitled.  The Court cannot, from the parties written submissions resolve this factual dispute and therefore summary judgment is precluded on this matter.

Plaintiff also alleges that Defendant's purported consideration of factors such as "waste, damage, obsolescence" or "damaged goods, bad inventory" in calculating the "Cost" deduction from "Net Sales" directly violates Ky. Rev. Stat. Ann. § 337.060(2)(e) which provides:

> (2) Notwithstanding the provisions of subsection (1) of this section, no employee shall deduct the following from the wages of employees . . .
>
> Losses due to defective or faulty workmanship, lost or stolen property, damage to property, default of customer credit, or nonpayment for goods or services received by the customer if such losses are not attributable to employee's willful or intentional disregard of employer's interest.

Defendant argues that because Plaintiff agreed that his gross sales would be reduced by Credit Memos and Bad Debt, the commission relating to such transactions cannot be considered part of his "agreed upon wages," which Defendant says are the only wages subject to Ky. Rev. Stat. Ann. § 337.060.  *See, e.g. AT&T v. Fowler*, __ S.W.3d__, 2007 WL 2684991 (Ky. Ct. App. 2007).

The applicability of § 337.060 ultimately depends on resolution of many of the same facts involved in Plaintiff's breach of contract claim, including how Defendant calculated "Cost."  Therefore, the Court will not decide the issue on the basis of the parties' summary judgment submissions.

The Court will enter an order consistent with this Memorandum Opinion.

21

cc:    Counsel of Record